# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
**No. 18-1358V**
**Filed: March 12, 2021**
UNPUBLISHED

| |
|---|
| REBECCA GOSSELINK, |
| Petitioner, |
| v. |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |
| Respondent. |

Special Master Horner

Finding of Fact; Tetanus, Diphtheria, and Acellular Pertussis (Tdap) Vaccine; Shoulder Injury; SIRVA; Onset

*Kristen Linnea Blume, Richard Gage, P.C. Cheyenne, WY, for petitioner.*
*Laurie Wiesner, U.S. Department of Justice, Washington, DC, for respondent.*

## FINDING OF FACT[1]

On September 5, 2018, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012)[2], alleging that as a result of a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccination received on December 13, 2016, she suffered a left shoulder injury. (ECF No. 1.)

Respondent recommended that compensation be denied, arguing, *inter alia*, that there is not preponderant evidence that petitioner's shoulder pain began within a timeframe that would support a finding of vaccine causation, namely 48 hours for a SIRVA. (ECF No. 40.) On September 30, 2020, a fact hearing was held regarding the issue of onset in this case. For the reasons described below, I find that petitioner experienced onset of shoulder pain within 48 hours of receiving her vaccination.

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

## I.      Procedural History

This case was originally assigned to Special Master Moran after petitioner filed her petition on September 5, 2018.  (ECF Nos. 1, 4.)  Petitioner then filed supporting medical records and a Statement of Completion.  (ECF Nos. 10-11.)  However, respondent requested further records upon preliminary review.  (ECF No. 27.)  Thereafter this case was reassigned to my docket before petitioner completed her filings of medical records.  (ECF No. 33.)

Petitioner filed additional medical records to support her petition.  (ECF Nos. 34, 36.)  On December 30, 2019, respondent filed his Rule 4(c) report, recommending against compensation.  (ECF No. 40.)  Respondent stated that petitioner's presentation is inconsistent with a SIRVA, specifically, that the records do not support an onset of a shoulder injury within 48 hours of vaccine administration.  (*Id.* at 6-7.)  Petitioner then filed additional records, including records to address the issue of onset.  (ECF Nos. 42, 51, 52, 58.)

A fact hearing was held on September 30, 2020.  (*See* ECF Nos. 62-63, Transcript of Proceedings ("Tr").)  Following the hearing, a status conference was held and respondent requested an opportunity to determine how to proceed.  (ECF No. 59.)  Respondent then requested a finding of fact regarding the initial onset of petitioner's shoulder pain.  (ECF No. 60.)  Petitioner filed her post hearing brief regarding onset on December 9, 2020.  (ECF No. 64.)  Respondent indicated in a status report that he relies on the facts and arguments in his Rule 4(c) report.  (ECF No. 65.)

This matter is now ripe for a finding of fact regarding the issue of onset.

## II.     Factual History

### a.  As Reflected in Medical Records

Petitioner has a history of cervical herniated disc and psoriasis.  (Ex. 1, p. 49.)  Petitioner also had right carpal tunnel syndrome, right trapezius pain, cervical foraminal stenosis, and cervical radiculitis.  (Ex. 9, pp. 1, 8, 11.)

On December 12, 2016, at 10:33 p.m., petitioner presented to the emergency department ("ED") regarding a dog bite on her right hand.  (Ex. 1, pp. 1-2.)  Petitioner had full range of motion and denied any numbness or tingling of the finger or hand.  (*Id.* at 2.)   She received a Tdap vaccination at this visit on December 13, 2016.  (*Id.* at 4.)  Petitioner was discharged on December 13, 2016 at 12:46 a.m.  (*Id.* at 5.)

On March 28, 2017, petitioner presented to the emergency department for abdominal pain and headache.  (Ex. 1, p. 48.)  The record indicated that petitioner was last seen at this ED in December 2016 for a dog bite.  (*Id.*)  Petitioner had "terrible, sharp, stabbing midline abdominal pain that began three days prior to arrival," at the ED.  (*Id.* at 48-49.)  Additionally, petitioner had migraines that disturbed her sleep.  (*Id.*

at 49.)  A review of systems was negative for myalgias and joint pain.  (*Id*. at 50.)  On physical examination, petitioner had full range of motion in all extremities without pain. (*Id*. at 51.)  Petitioner's labs were unremarkable, and she was treated with antacid.  (*Id*. at 52.)  Petitioner was assessed with elevated blood pressure and acute gastritis.  (*Id*. at 53.)  Petitioner was ordered to follow up with Dr. Jatin Daas and Dr. Sukhdeep S. Padda.  (*Id*. at 54.)

Petitioner saw Dr. Daas the next day, on March 29, 2017 to establish new patient care and regarding management of her abdominal pain following her visit to the emergency room.  (Ex. 3, p. 1.)  Petitioner was assessed with epigastric pain and was started on dicyclomine and promethazine.  Petitioner reported joint pain and neck pain, but denied back pain, joint swelling, and muscle aches upon a review of systems.  (*Id*. at 2.)  General examination of her extremities indicated that petitioner did not have clubbing, edema, or cyanosis.  (*Id*. at 1-2.)  Dr. Daas referred petitioner to Dr. Padda for further gastroenterology workup.  On April 12, 2017, petitioner had a follow up visit with Dr. Daas regarding her abdominal pain.  (Ex. 3, p. 3.)  Petitioner reported that she was "doing well."  Petitioner's record was otherwise similar to her March 29, 2017 visit.  (*Id*. at 3-4.)

Petitioner returned to see Dr. Daas on May 16, 2017 for a follow up appointment. (Ex. 3, p. 5.)  At this appointment, Dr. Daas assessed petitioner with pain in left shoulder and started petitioner on prednisone.  (*Id*.)  Petitioner's musculoskeletal review revealed that petitioner denied back pain, joint swelling, and muscle aches, but reported joint pain and neck pain.  Additionally, general examination of her extremities revealed similar findings as previously indicated that petitioner did not have any clubbing, edema, or cyanosis.  (*Id*. at 5-6.)

On May 22, 2017, petitioner saw Daniela L. Briscoe, P.A. instead of Dr. Daas for a follow up appointment regarding her left shoulder pain.  (Ex. 3, p. 7.)  P.A. Briscoe noted that petitioner reported experiencing left shoulder pain and limited range of motion since December 2016 following a Tdap vaccination in her left deltoid.  (*Id*.) Petitioner reported mild pain at first with limitations when using her left arm, but her pain had been worsening and now she had been experiencing severe pain and limitations within the last couple of weeks.  (*Id*.)  Petitioner indicated that prednisone provided significant pain relief, but only slight improvement regarding range of motion.  Petitioner admitted to back pain and paresthesia, but denied upper back pain.[3]  (*Id*.)  P.A. Briscoe noted that petitioner complained of left shoulder pain and limited range of motion under a review of systems.  (*Id*. at 8.)  Upon examination, P.A. Briscoe found no focal tenderness or deformity regarding petitioner's left shoulder.  However, petitioner had

---

[3] In fact, this record contains contradictory notations regarding whether petitioner was experiencing paresthesia.  Under History of Present Illness, it indicates "admits to paresthesias in left arm and forearm."  (Ex. 3, p. 7.)  However, the review of systems for the same encounter indicates for neurology that "patient denies paresthias in left arm and forearm, see HPI."  (*Id*. at 8.)  In light of these conflicting notations, I asked petitioner to clarify whether she was experiencing numbness and tingling at that time. (Tr. 83-84.)  She testified that she does not remember that being one of her complaints.  (*Id*.)  This is consistent with P.A. Briscoe's focus in her treatment plan on a shoulder pathology such as adhesive capsulitis and not on any neurological complaint.  (Ex. 3, p. 8.)

pain with any movement including passive range of motion. (*Id*. at 7.) Petitioner was assessed with pain in left shoulder and suspected to have adhesive capsulitis. P.A. Briscoe ordered x-ray imaging and recommended physical therapy for petitioner. (*Id*. at 8.)

The next day, petitioner filled out her health history at OSR for physical therapy. (Ex. 4, p. 1.) Petitioner noted that her pain started on December 15, 2016, and moreover that she experienced pain for five months. (*Id*.) However, petitioner also indicated that the date of onset of her pain was December 12, 2016 as part of her paperwork for OSR physical therapy. (*Id*. at 4.) Petitioner was evaluated on June 1, 2017 for pain in her left shoulder with onset date of December 15, 2016. (*Id*. at 11.) It was noted that petitioner had a dog bite in December and her left arm had been painful since tetanus shot. (*Id*. at 10-11.)   Petitioner was recommended physical therapy three times a week for four weeks. (*Id*. at 13.)

On June 12, 2017, petitioner saw Dr. Justin Wong for the first time regarding her left shoulder pain. (Ex. 2, p. 3.)   Dr. Wong recorded that petitioner's left shoulder pain began in December 2016 when she received a tetanus shot.   He indicated that petitioner "feels her tetanus shot is the root cause of the pain." (*Id*.)   Petitioner reported that physical therapy did alleviate her pain but she still had significant stiffness and severe and sharp pain. (*Id*.)   Dr. Wong assessed petitioner with left shoulder adhesive capsulitis and enchondroma of shoulder. (*Id*. at 4.)

On June 26, 2017, petitioner had an upper extremity MRI. (Ex. 2, p. 16-17.)   Her findings included an impression of adhesive capsulitis. (*Id*. at 16.)   Petitioner then saw Dr. Wong again on July 5, 2017 to review MRI results and receive a cortisone injection. (Ex. 2, p. 18.)   Again, Dr. Wong included as part of petitioner's history that petitioner had left shoulder pain "which was caused after a tetanus shot given because of a dog bite." (*Id*.)   Dr. Wong indicated that there was no swelling in petitioner's left shoulder and there was good strength, however, petitioner's range of motion was limited and there was still pain and stiffness. (*Id*.)   Dr. Wong noted that the MRI study showed tendinitis of the rotator cuff crescent and biceps tendon, adhesive capsulitis and blunting of the labrum, and enchondroma of the proximal humerus. (*Id*.)   Petitioner received a joint injection at this visit and was recommended to continue home exercises to increase strength and range of motion. (*Id*. at 18-19.)

Petitioner saw Dr. Wong on July 27, 2017 for a follow up concerning her left shoulder pain. (Ex. 2, p. 22.)   At this visit, Dr. Wong added to petitioner's history of present illness that petitioner's symptoms started with soreness about six months prior and then by April or May, petitioner experienced significant shoulder stiffness. Petitioner reported that her pain was reduced following her steroid injection. (*Id*.) Petitioner received another steroid injection at this visit. (*Id*. at 23.)

In August of 2017, petitioner was seen by orthopedist Neal Rockowitz, M.D., in connection with a workers' compensation claim. (Ex. 11, p. 10-12.)   Dr. Rockowitz concluded that petitioner's shoulder symptoms were related to her work injury. (*Id*.)

(The dog bite that prompted the tetanus injection occurred while petitioner was working.)  The remainder of petitioner's history is not illuminating as to the initial onset of her shoulder symptoms.

### b. As Reflected in Testimony

Prior to her December 13, 2016 Tdap vaccination, petitioner did not have any issues with her left shoulder.  (Ex. 5, p. 1; Tr. 5.)  However, petitioner had issues concerning her right side that were resolved before she received the vaccination at issue.  (Tr. 5-6.)  Petitioner had a history of carpal tunnel syndrome from her data entry job in her right hand that included numbness and tingling.  (Tr. 79-82.)  Petitioner also had joint pain that she associates with age and a history of psoriasis and arthritis in her knees.  (*Id.*)  Petitioner indicated that she had never received chiropractic treatment or non-traditional treatment.  (Ex. 7, p. 2.)

Petitioner testified that she received the Tdap vaccination at the emergency room in her left shoulder.  (Tr. 6-8.)  Petitioner was working at the gas station and was bitten by a dog on her right index finger, which caused her to visit the emergency room and receive the Tdap vaccine.  (Ex. 5, p. 1; Tr. 6-8.)  Petitioner testified that upon injection, she felt immediate pain.  (Tr. 8.)  Petitioner recalled that the nurse that gave her the vaccination wiped lower on her arm than the actual injection site.  (Tr. 10.)  Petitioner indicated that she winced upon receiving the injection and can still feel a knot where she was injected with the vaccine.  (Tr. 10-12.)  In the immediate hours after receiving the vaccine, petitioner's arm was sore and ached, but the pain was not sharp.  (Ex. 5, p. 1; Tr. 11-12.)  The following day, her arm was still sore, stiff, and painful, and she had trouble making breakfast for her granddaughter.  (Tr. 13.)  Petitioner indicated that there was swelling, redness, and warmth at the injection site, so she applied ice.  (*Id.*)

Petitioner testified that over the next couple of days, her range of motion was impeded and she could not reach up.  (Tr. 14-15.)  Around Christmas, petitioner remembered having a hard time while baking cookies and she wasa more limited in cooking, cleaning, brushing her hair, and getting dressed.  (Tr. 16-17.)  Petitioner assumed that because she was getting older, that the normal residual effects of vaccination were taking longer to overcome and she continued icing her arm.  (Tr. 15, 20, 41.)  On New Year's Eve, while getting ready to go out, petitioner struggled to put on her jacket and collapsed on her couch from the pain.  (Ex. 5, p. 1; Tr. 18-20.)  Thereafter, petitioner started calling different physicians to inquire about her pain.  (Tr. 19-20.)  She spoke to a nurse, who told her that some people have bad reactions to a tetanus shot and may take a little longer like up to four weeks.  (Tr. 20.)  Petitioner accepted the nurse's advice because at that time, petitioner was focused on her new temporary job at CIGNA.  (Tr. 20.)  Petitioner also indicated that she talked to someone at Walgreens pharmacy about the pain she was experiencing from her Tdap vaccination some time in January.  (Ex. 5, p. 1; Tr. 14-15.)

Petitioner averred that throughout January through March, her arm was getting worse and she struggled to carry large files at CIGNA.  (Tr. 21-23.)  In March (Ex. 1, p.

48), she saw a doctor for her abdominal pain and was diagnosed with gastritis. Although the records may indicate that she had full range of motion, petitioner recalled that at this visit, her arm was never examined, and she did not mention her arm pain although she was still experiencing it. (Tr. 24-28.) Petitioner then saw Dr. Daas for a follow up regarding her abdominal pain and petitioner recalled telling him about her arm. Petitioner testified that Dr. Daas showed her where on her arm the injection was supposed to occur and told her to apply ice and take ibuprofen for the pain. She was treated for her stomach pain only. (Tr. 28-32.) Petitioner saw Dr. Daas again on April 12, 2017 for her gastric issues, but her stomach pain was much better. (Tr. 32-35.) At this appointment, petitioner testified that when petitioner brought up her arm pain, Dr. Daas expressed that he was unaware of a tetanus shot causing pain for such a duration. (*Id.*)

Throughout April and May, petitioner continued having pain and around Mother's Day, petitioner woke up in the middle of the night in pain and called Dr. Daas. (Tr. 36-39.) Petitioner was given prednisone, but was still in pain. Petitioner had an appointment on May 22, 2017 and saw PA Briscoe instead of Dr. Daas regarding her arm pain. (Tr. 38-45.) Petitioner was diagnosed with adhesive capsulitis and referred to a specialist and to start physical therapy. (*Id.*) Petitioner denied experiencing any numbness and tingling associated with her shoulder pain. (Tr. 79, 83.) The following day, petitioner filled out paperwork regarding her physical therapy. (Tr. 47-50.) Here, petitioner provided an approximation of dates for onset of pain as December 15, 2016 and December 12, 2016. (*Id.*) By June 7, 2017, petitioner had severe, sharp pain, but physical therapy did provide some relief. (Tr. 55-58.)

Petitioner saw an orthopedic specialist, Dr. Wong, who wanted her to keep going to therapy. (Tr. 58-62.) Petitioner indicated that she could still feel the injection site and relayed this to Dr. Wong. (*Id.*) Petitioner testified that Dr. Wong couldn't give her an estimate of when her arm would be cured. (Tr. 61-62.) Petitioner also recalled talking to her x-ray technician about receiving the tetanus shot and the technician commented on the possibility of petitioner's bursa being nicked when she received the injection. (Tr. 58-59.)

Petitioner testified that presently, she would still feel a pinch depending on how she was positioned when sitting or on long trips. (Ex. 5, p. 2; Tr. 68-70.) Regarding her range of motion, she indicated that she can now wash her hair and do other normal things, but was still experiencing symptoms. (*Id.*) Petitioner indicated that the pain was mild and limited after receiving the vaccination, but worsened in May, to the point where she felt "locked up," where her shoulder was frozen and she was totally impaired. (Tr. 71-73.) Overall, petitioner agreed that her pain gradually worsened over time. (Tr. 72.) Petitioner made a Facebook post regarding experiencing seven months of pain from a tetanus shot that resulted in a bursa injury. (Tr. 76; Ex. 14.)

Jessica Hayes, petitioner's daughter, stated that petitioner went to the local emergency room to receive a tetanus shot following being bit by a dog. (Ex. 12, p. 1.) Ms. Hayes testified that petitioner lived in the same apartment complex and came by in

the mornings to help with her daughter, petitioner's granddaughter.  (Tr. 94.)  Ms. Hayes testified that petitioner indicated that the nurse that gave the Tdap vaccination was negligent and made a joke relating to the injection site.  (Tr. 94-95.)  Petitioner told Ms. Hayes that the shot hurt and Ms. Hayes remembered that the morning following the tetanus shot petitioner's arm was sore.  (Ex. 12, p. 1; Tr. 95.)  Additionally, petitioner indicated, about a week later that her arm was still sore, painful, and getting worse.  (Ex. 12, p. 1; Tr. 95.)  Ms. Hayes indicated that the injection site was red, slightly inflamed, and warm to touch a week after receipt of the vaccination.  (Ex. 12, p. 1.)  Ms. Hayes testified that over the next couple weeks, petitioner couldn't do light housework or wash her hair, and around Christmas, she couldn't carry things.  (Ex. 12, p. 2; Tr. 95-96.)  Additionally, on New Year's Eve, Ms. Hayes remembered that when petitioner tried to put on a jacket, she yelled out in pain and fell back on the couch.  (Tr. 96-97.)

Additionally, Ms. Hayes represented that she was there when petitioner spoke to their neighbor, who was a nurse, about a week after vaccination regarding her sore arm.  (Ex. 12, p. 1; Tr. 101.)  The nurse looked at petitioner's arm and told petitioner that it wasn't normal for the soreness to last that long.  (Tr. 102.)   Ms. Hayes stated that petitioner's mobility in her shoulder deteriorated and her range of motion was "less and less every day."  (Ex. 12, p. 2.)  Ms. Hayes stated that petitioner still suffers from shoulder pain today in carrying out daily activities.  (*Id.*)

### III.    Standard of Adjudication

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 300aa-11(c)(2).  The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1)(A).  The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony.  *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).  Petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim.  § 300aa–13(a)(1)(A).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems).  *Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528; *Doe v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's

medical records was rational and consistent with applicable law").  This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions.  *Sanchez v. Sec'y of Health & Human Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992), aff'd, 993 F.2d 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence.  *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir.), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992) (*citing United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate.  *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (*quoting Murphy*, 23 Cl. Ct. at 733).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling."  *Sanchez*, 2013 WL 1880825, at *3 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms

that did not exist. *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 203–04 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

## IV.    Discussion

The Vaccine Act instructs that the special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such a period." § 300aa-13(b)(2). However, consistent with petitioner's burden of proof overall, that finding must be supported by preponderant evidence. *Id.* Upon my review of the entire record, I find preponderant evidence that petitioner's alleged vaccine-caused shoulder pain began within 48 hours of her December 13, 2016 Tdap vaccination.

Petitioner testified that after receiving the vaccination, she immediately felt pain in her arm and expressed her pain to the nurse that administered the vaccination. (Tr. 8, 10-11.) Petitioner believed that her shoulder pain was typical following vaccination and alleged that she was instructed to give her shoulder time to heal. Petitioner consistently reported that her pain started on the day of her vaccination. I find the testimonies from petitioner and her daughter, Ms. Hayes, to be credible regarding the onset of petitioner's shoulder pain. Both petitioner and Ms. Hayes testified consistently that petitioner experienced pain the morning following the vaccination as well as throughout the holiday season, including a memorable incident on New Year's Eve regarding petitioner's attempt to put on her jacket that resulted in pain. (Tr. 13, 16-18, 94-97.) This testimony is also corroborated by the contemporaneous medical records insofar as when later seeking treatment petitioner consistently related onset of her shoulder pain to her tetanus vaccination. (Ex. 3, pp. 5-6, Ex. 4, p. 10; Ex. 2, p. 3.)

Respondent argues that the records do not support petitioner's claim that she experienced an onset of pain in her left shoulder within 48 hours of vaccination, because she did not report shoulder pain at the first opportunity and the first recorded complaint of shoulder pain was on May 12, 2017, five months following vaccination. (ECF No. 40, p. 6-8.) However, in prior SIRVA cases it has been held that neither a delay in seeking treatment in itself, nor a failure to report symptoms to a specialist or emergency room provider prior to later seeking treatment, is necessarily dispositive of whether a petitioner's shoulder pain began within 48 hours of vaccination. *See Forman-Franco v. Sec'y of Health & Human Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018); *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied* 142 Fed. Cl. 329 (2019); *Gurney v. Sec'y of Health & Human Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Mar. 19, 2019).

In this case, petitioner testified that she first spoke to Dr. Daas about her shoulder pain during her first visit on March 29, 2017, which was an appointment specifically made to address her abdominal pain following her visit to the emergency room, but was also the appointment at which she first established care with Dr. Daas. (Tr. 28-32; Ex. 3, p. 1.)  Importantly, although petitioner's report of shoulder pain was not recorded in Dr. Daas's March 29, 2017 record, there is also evidence that Dr. Daas did not keep complete or accurate records.  For example, as discussed during the hearing, Dr. Daas recorded that petitioner had cataracts and glaucoma (Ex. 3, p. 2), although petitioner denied such history (Tr. 31-32).  More directly relevant to petitioner's shoulder pain, during the May 16, 2017 visit at which Dr. Daas did later assess petitioner with shoulder pain, the notations under review of systems regarding musculoskeletal complaints remained unchanged from prior visits.  Moreover, despite assessing shoulder pain, Dr. Daas did not document any description of the onset of petitioner's pain or record any examination specific to petitioner's range of motion.  (Ex. 3, pp. 5-6.)  In fact, the first record to clearly discuss onset of shoulder pain stems from the appointment when petitioner saw P.A. Briscoe instead of Dr. Daas.  (Ex. 3, p. 7.) P.A. Briscoe's notes are of a distinctly higher quality than those of Dr. Daas.

The inconsistencies and lack of detail in Dr. Daas's records from the relevant period suggest that Dr. Daas's records are less reliable than the other record evidence as to the issue of onset of shoulder pain.  *See Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (Fed. Cl. 1991) *aff'd* 968 F.2d 1226 (Fed. Cir. 1992) (noting that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance … the fact that reference to an event is omitted from the medical records may not be very significant."); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent.") (quoting *Murphy*, Cl. Ct. at 733).  Taken as a whole, petitioner's treating physicians' records preponderate in favor of a finding that petitioner experienced shoulder pain within 48 hours of her December 13, 2016 vaccination.

During her visit with P.A. Briscoe to address her shoulder pain specifically, petitioner indicated that she had shoulder pain since her tetanus vaccination.  (Ex. 3, p. 7.)  Following her appointment with P.A. Briscoe, petitioner was referred to physical therapy and again reported that she had been experiencing shoulder pain since her tetanus vaccination.[4]  (Ex. 4, p. 10.)  Petitioner's orthopedic specialist, Dr. Wong, likewise recorded that petitioner's pain began in December 2016 when she received the

---

[4] One portion of petitioner's physical therapy intake records additionally records an onset of December 12, 2016, which corresponds to the date of petitioner's emergency room visit (though the visit extended into the early morning of December 13, 2016).  (Ex. 4, p. 4; Ex. 1, pp. 1-4.)  However, a further notation on the intake forms indicates onset was December 15, 2016.  (Ex. 4, p. 1.)  Petitioner indicated in testimony that these dates were approximations based on her trying to recall the specific date she was seen in the emergency department.  (Tr. 47-49.)  Petitioner's testimony that she told the physical therapist that her shoulder started hurting when she received her injection (Tr. 50) is supported by the physical therapist's own evaluation notation "tetanus shot in L arm painful since" (Ex. 4, p. 10).  Accordingly, the physical therapy record as a whole supports an immediate post-vaccination onset.

tetanus shot.  (Ex. 2, p. 3.)  Dr. Rockowitz likewise concluded in the context of her workers' compensation claim that petitioner's shoulder symptoms were related to the dog bite and tetanus injection occurring in December of 2016.  (Ex. 11, p. 10.)

## V.    Conclusion

In light of the above, there is preponderant evidence that petitioner experienced left shoulder pain within 48 hours of her December 13, 2016 Tdap vaccination.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master